
UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

*****************************************************************

| | | |
|---|---|---|
| TERRI LAFONTAINE TORGERSON and BIG TALK, INC., a South Dakota corporation, | * * * | CIV 05-1050 |
| Plaintiffs, | * * | |
| -vs.- | * * * | MEMORANDUM OPINION AND ORDER |
| WELLS FARGO BANK SOUTH DAKOTA, N.S., a corporation, | * * * | |
| Defendant. | * * | |

*****************************************************************

Plaintiffs filed an amended complaint, contending that defendant's conduct surrounding various loan applications violated the Federal Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, the Fair Housing Act, 42 U.S.C. § 3605, and the Civil Rights Acts, 42 U.S.C. §§ 1982 and 1983. Plaintiffs also allege state law claims of violation of a claimed duty to refrain from self-serving conduct, negligence, fraud, deceit, and reckless and intentional conduct entitling plaintiffs to punitive damages.

Defendant filed a motion for partial summary judgment (Doc. 41) as to all claims but the violation of duty, fraud and deceit claims, and punitive damages.

## DECISION

The summary judgment standard is well known and has been set forth by this court in numerous opinions. *See* Hanson v. North Star Mutual Insurance Co., 1999 DSD 34 ¶ 8, 71 F.Supp.2d 1007, 1009-1010 (D.S.D. 1999), Gardner v. Trip County, 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D. 1998), Patterson Farm, Inc. v. City of Britton, 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088-89 (D.S.D. 1998), and Smith v. Horton Industries, 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D. 1998). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Donaho v. FMC Corp., 74 F.3d 894, 898 (8th Cir. 1996). The United States Supreme Court has held that:

> The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "A material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." Landon v. Northwest Airlines, Inc., 72 F.3d 620, 634 (8th Cir. 1995). In considering the motion for summary judgment, this Court must view the facts in the light most favorable to plaintiff and give plaintiff the benefit of all reasonable inferences that can be drawn from the facts. Donaho, 74 F.3d at 897-98.

Defendant submitted a statement of undisputed material facts as required by D.S.D. LR 56.1(B). Plaintiffs did not set forth a "statement of the material facts as to which it is contended that there exists a genuine issue to be tried" and did not respond to each numbered paragraph in defendant's statement of facts as required by D.S.D. LR 56.1(C). Instead, plaintiffs submitted a 24 page brief setting forth their version of the facts. This fails to meet the clear requirements of the rule. As required by D.S.D. LR 56.1(D), all material facts set forth by the defendant in its statement of undisputed material facts are deemed to be admitted.

Plaintiff Terri Torgerson ("Torgerson") owned all stock in a corporation which operated a propane business in Sisseton, South Dakota. She had a ten year banking history with Marquette Bank, which bank is now known as Wells Fargo Bank. That history included several loans and lines of credit with Wells Fargo, all with a good repayment history.

Plaintiff Big Talk, Inc. ("Big Talk"), a corporation allegedly wholly owned by Torgerson, was, as alleged in the amended complaint, "intended for use by Plaintiff in the acquisition and operation of Taco John's restaurants." However, Big Talk does not appear anywhere in the record until October 2003, where it is listed as the only applicant for a loan from Wells Fargo. Plaintiffs' answers to interrogatories, which are now on file, show that Torgerson was employed by Big Talk, beginning in 2003. The on-line records from the South Dakota Secretary of State show that Big Talk was not incorporated until October 2003. Therefore, Big Talk has no standing as to plaintiffs' first through fifth claims for relief.

Sometime in the year 2000 or 2001, plaintiff, her husband Les ("Les") Torgerson, and her business consultant, Jerry Vrchota, met with Wells Fargo employee Daryl Ebach to discuss a loan request for the purposes of building a Taco John's restaurant in North Dakota. A second meeting concerning that same venture occurred, although Torgerson cannot recall the name of the additional employee she met with. She did not actually fill out an application but contends that she clearly approached Wells Fargo requesting a loan. She contends that Wells Fargo did not offer her a loan application and she assumed the bank would prepare the application for her. No such application was prepared. Torgerson, Les and Vrchota did not follow up on the loan request. There is nothing in the record to show that any specific amount was requested or that any security for a loan was offered. She contended in her amended complaint that the bank's failure to respond to her loan "request" violated the Equal Credit Opportunity Act and that the bank's failure to respond evidenced discrimination against her based upon her race and gender, all in violation of 42 U.S.C. §§ 1981 and 1982. Those claims were dismissed by the Court because Torgerson did not assert the claims within the applicable statute of limitations.

Torgerson's banking relationship with Wells Fargo continued after the failed inquiry concerning the Taco John's venture. She subsequently obtained from Wells Fargo term loans, increases in existing lines of credit, and new home equity lines of credit.

On October 15, 2002, Dakota Sioux Propane, Inc., with all stock owned by Torgerson, entered into a contract with the Sisseton Wahpeton Sioux Tribe for the sale of the propane business for $1.3 million. The tribe sought a loan from Wells Fargo to purchase the business. On October 29, 2002, Wells Fargo approved the loan to the Tribe on the condition that the Bureau of Indian Affairs ("BIA") provide a guaranty for the Tribe's loan. The guaranty could not be obtained until an appraisal was obtained, a mortgage survey and title search were completed, and an environmental assessment was received.

Torgerson admits that she did not have any involvement in the Tribe's loan application with Wells Fargo. She contends that Wells Fargo discriminated against her, the proposed claimed recipient of the loan proceeds, based upon her race and gender by insisting that the Tribe's loan be guaranteed by the BIA and by delaying in obtaining the necessary prerequisites to the BIA guaranty. She, of course, was not the seller to whom the sale proceeds would be paid and the seller is not a party in this action. She contends that she told bank employees that she

3

wanted the Tribe's loan to be closed before the new Tribal Council was seated in January because the new council may not honor the agreement to purchase her propane business.

Wells Fargo ordered an appraisal from an independent contractor on November 5, 2002. An independent appraisal was completed on January 19, 2003. Following receipt of the appraisal and other prerequisites, the BIA approved the request for a BIA loan guarantee on February 3, 2003, contingent upon certain conditions. The loan to the Tribe closed in June 2003.

Torgerson claims that Wells Fargo's actions in failing to request an expedited appraisal delayed the closing of the loan to the Tribe. She claims such delay violated a duty owed to her because she was a customer of Wells Fargo and the delay was intentional for the purpose of fostering a banking relationship with the Tribe (through the new Tribal Council), which conduct Torgerson claims constituted a conflict of interest. Torgerson also claims that Wells Fargo's actions in failing to timely (i.e., in time to get the Tribe's loan closed prior to the seating of the new Tribal Council) submit the appraisal to the BIA to obtain the loan guarantee violated a common law duty owned by Wells Fargo to its customer, Torgerson, constituting negligence. Torgerson further claims that Wells Fargo's actions in misrepresenting to her (or, more correctly, to Les) the facts surrounding the timely obtaining of the BIA loan guarantee for the Tribe's loan constitute fraud and deceit. Finally, Torgerson claims that Wells Fargo acted with discriminatory intent towards her in its actions in delaying the closing of the loan to the Tribe, in violation of the Fair Housing Act, the Equal Credit Opportunity Act, and 42 U.S.S. §§ 1981 and 1982. The Fair Housing Act, Equal Credit Opportunity Act, and 42 U.S.C. § 1981 claims as to the Tribe's loan have been dismissed by the Court for failure to state a claim.

In October 2003, Torgerson applied for and received a line of credit in the amount of $125,000 from Wells Fargo, which line of credit was secured by a mortgage on her home in Sisseton. She does not contend that Wells Fargo discriminated against her with respect to this loan. At that same time, Torgerson claims she applied for a $250,000 business and commercial loan to be used as start-up capital for the Taco John's restaurant she was building in Browning, Montana. In actuality, it was Big Talk that was listed as the borrower on the loan application. Big Talk did not have any assets at that time and may not even have been incorporated. The land in Montana was owned solely by Torgerson and apparently still is at this time. Clearly, if Big

Talk were to place a building on land owned by Torgerson, the building would become a fixture. Restaurant equipment would also become a fixture. A severance agreement before attachment might have protected Big Talk and any creditor of Big Talk. These are important details, at least under the law of South Dakota. Big Talk proposed that the collateral for the loan would be the land, building, and equipment utilized for the restaurant, but there is nothing in the record to show that Big Talk owned or would own any of this collateral. The total project cost was $600,000 but Torgerson intended to use $350,000 of her own funds to finance the project. She claims she told Jane Schneider, her banker at the Sisseton branch, that the loan needed to be closed prior to December 1, 2003, as that was the date the Browning restaurant was set to open.

Wells Fargo employee Jane Schneider sent the loan application to Wells Fargo underwriting on October 22, 2003. The underwriter, Greg Ross from the Billings, Montana, underwriting office of Wells Fargo, requested additional information from Schneider on October 27, 2003. Schneider responded to Ross on November 6, 2003, advising Ross, *inter alia*, that the restaurant would be built on a reservation and that Torgerson is a tribal member in South Dakota. Torgerson claims she was told by Schneider on November 15, 2003, that the loan had been approved and Torgerson went to the bank for the loan closing on November 21, 2003. At that time she was advised that Mark Wolff, the president of the Milbank branch, had taken over her loan application. She contends that Wolff thereafter delayed the loan process. Ross e-mailed Schneider on November 24, 2003, stating that "the 30 day reg B period has lapsed or perhaps is on the 30th day. You need to take the appropriate measure per Reg B policy." Perhaps choosing not to follow that advice, Wolff orally and in writing advised Torgerson on November 26, 2003, that additional information would be needed prior to approval of the loan request. On December 1, 2003, Torgerson declined, in writing, to provide additional information. On December 2, 2003, Ross recommended declining credit. Bank records show that Schneider "reversed" the recommendation to deny credit on December 10, 2003. Wolff "approved with comments" on that same date. On December 11, 2003, Wolff sent Torgerson a written proposal for providing a loan with different terms. Wolff's "counter-offer" loan was contingent upon Torgerson providing a mortgage on her home on Lake Kampeska, South Dakota. The loan was apparently to be made to Torgerson and not Big Talk. Torgerson never responded to that loan offer.

Instead, she sold her Lake Kampeska home, apparently in May of 2004, and used the proceeds from the sale for capital for the Browning, Montana, Taco John's restaurant.

Torgerson alleges that "she" met all financial and credit requirements and was qualified to receive the 2003 loan on the terms for which "she" applied. Once again, a review of the loan application shows that the only applicant for the loan at issue was Big Talk.

Plaintiffs contend that Wells Fargo neither granted nor denied the loan application. Instead, Wells Fargo requested additional financial information from Torgerson which she declined, in writing, to provide. She stated in her December 1, 2003, letter to Wolff declining to provide the information, that she was too busy to gather the requested information and that she was "feeling uncomfortable as a Native American Businesswoman, I am being treated differently." She stated:

> When I approached Wells Fargo for my Taco John's loan I believed that with my ten year banking history, my past business success, my assets and the amount of capital I have invested in the project that it would be relatively smooth process.

Torgerson then, in that same letter, accused Wolff of being "the reason for the delay in the sale of my company by not completing the BIA Guarantee Packet in a timely manner . . . I lost a substantial amount of money because of that delay and now you are delaying this loan."

Plaintiffs contend that Wells Fargo's alleged actions in delaying, denying, or refusing to act upon the 2003 business and commercial loan application were done with racially and sexually discriminatory intent, in violation of the Fair Housing Act, the Equal Credit Opportunity Act, and 42 U.S.C. §§ 1981 and 1982. They further contend that Wells Fargo failed to properly respond to the 2003 loan application within 30 days, in violation of the Equal Credit Opportunity Act. Finally, plaintiffs contend that Wells Fargo committed fraud and deceit by falsifying bank records to show that plaintiffs had withdrawn the 2003 loan application.

**I. Claims as to Loan to Tribe.**

Torgerson's negligence claim as to the bank's conduct surrounding the loan to the Tribe cannot proceed unless she establishes a duty on the part of the defendant to protect the plaintiff. Gilbert v. United Nat. Bank, 436 NW2d 23, 27 (SD 1989). "The determination of whether a duty exists is a question of law for the court." *Id.*

Under South Dakota law, a stranger to Wells Fargo's banking relationship with the Tribe "is owed no duty in the absence of a contract, statute, or other special circumstance giving rise to such a duty." *Id.* Torgerson contends that, since she too was a bank customer, Wells Fargo owed her a duty in the bank's dealings with another customer. Plaintiffs have cited no statute or case law which creates a duty on the part of a bank toward the intended recipient of loan proceeds, even where the recipient is also a bank customer. As previously explained, Torgerson personally was not the intended recipient of the sale proceeds, at least initially. It is not a simple matter to move money from a corporation to a stockholder, especially if the corporation is not a subchapter S corporation. To further complicate matters, the intended recipient of the sale proceeds was a non-party, Dakota Sioux Propane, Inc.

The South Dakota Supreme Court has observed:

> In the context of the relationship between a depositor and a bank, the South Dakota Supreme Court has consistently held that, in the absence of a special arrangement, the relationship between the two is that of a creditor and debtor and nothing more. *Flaherty Brothers v. Bank of Kimball*, 75 S.D. 468, 68 NW2d 105 (1955) and *Haman v. First National Bank in Sioux Falls*, 115 NW2d 883 (1962).

Garrett v. BankWest, Inc., 459 NW2d 833, 838 n. 3 (SD 1990). As applied to the loan to the Tribe, Torgerson was a mere customer of the bank. Even if Torgerson had been the borrower in that transaction, no special duty would exist absent evidence that Torgerson "repose[d] a faith, confidence and trust in the bank which results in dominion, control or influence over the borrower's affairs. Finally, the borrower who reposes the confidence must be in a position of 'inequality, dependence, weakness or lack of knowledge.'" Garrett v. Bank West, 459 NW2d at 838 (*quoting* Union State Bank v. Woell, 434 NW2d 712, 721 (ND 1989)).

Torgerson was certainly not the borrower in the bank's transaction with the Tribe. Absent any legal duty, her relationship with the bank was merely contractual in nature, defeating any negligence claim. Summary judgment is proper as to Torgerson's negligence claim set forth in the third claim for relief. There is no genuine issue of any material fact as to the matter.

Defendant asserts that summary judgment is appropriate as to Torgerson's 42 U.S.C. § 1982 claim concerning the loan to the Tribe because she cannot establish intent to discriminate on the basis of race or gender. Section 1982 protects "citizens' rights to make and enforce

contracts and purchase both personal and real property without any impairment due to private or public racial discrimination." Daniels v. Dillard's, Inc., 373 F.3d 885, 887 (8th Cir. 2004). In order to establish a prima facie case, a plaintiff must show:

>  (1) membership in a protected class,
>  (2) discriminatory intent on the part of the defendant, and
>  (3) interference with the rights or benefits connected with the ownership of property.

*Id.* Defendant contends that Torgerson cannot demonstrate the second element, discriminatory intent, concerning the loan to the Tribe.

"[D]irect evidence is not necessary to raise a reasonable inference of discriminatory intent." Green v. Dillard's, Inc., 483 F.3d 533, 540 (8th Cir. 2007). Torgerson claims in her brief that discriminatory intent as to the alleged delay in the loan to the Tribe can be shown by the following statements and actions, which statements and actions she contends demonstrate discriminatory animus:

> • The underwriter made statements to the effect that the Tribe must be told that they had to collect the propane business' accounts receivable in order to repay the loan.
> • Mark Wolff stated that "if the business was run properly, was managed properly, it should be a good deal for the Tribe."
> • The bank required that the Tribe obtain a 90% BIA guarantee, at a cost to the Tribe of $25,000, for a $1.3 million loan despite the fact that the Tribe had a $19 million net worth and $29 million cash flow (from casino activities).
> • The interest rate offered to the Tribe was .75% over Wall Street Prime.
> • Expert testimony that a loan guarantee (for example, an SBA guarantee) would not have been required to close a similar loan for a "white" business.

Plaintiffs have recently brought to the attention of the Court a letter from Wells Fargo to the tribe, discouraging the tribe from honoring its contract to buy the propane business. It is absolutely incredible that Wells Fargo would attempt to interfere with an existing contract. Such evidence is important in determining the motives and intentions of Wells Fargo.

I was the "trial judge" in Oti Kaga, Inc. v. South Dakota Housing Dev. Authority, 188 F.Supp. 2d 1148 (D.S.D. 2002). I entered a summary judgment in favor of the defendants. On appeal, the United States Court of Appeals affirmed. *See* Oti Kaga, Inc. v. South Dakota

Housing Development, 342 F.3d 871 (8th Cir. 2003). The Court of Appeals, however, found that I had erred in deciding that the plaintiff not-for-profit corporation could not assert rights on behalf of third-parties who were not named plaintiffs. Under the Fair Housing Act, the corporation could assert rights of Native American beneficiaries.

In the present case, as already discussed, we have the "propane corporation" as the seller of the propane business to the tribe. Torgerson, as the sole shareholder in such corporation, claims discrimination by defendant in connection with the loan to the tribe. Thus, the factual situation is not the same as in Oti Kaga. The "propane corporation" is not a party in this lawsuit.

In an abundance of caution, I will permit Torgerson to assert discrimination allegedly suffered by the "propane corporation." The records from the South Dakota Secretary of State show that Dakota Sioux Propane, Inc. was administratively dissolved in 2004. The last annual statement was filed in 2002. The record reflects that Torgerson was the president of Dakota Sioux Propane, Inc., from 1994 to 2003.

Genuine issues of material fact exist as to discriminatory intent, which issues preclude summary judgment on Torgerson's § 1982 claim arising out of the loan to the Tribe.

## II. Claims as to 2003 Commercial Loan Application.

Defendant contends it is entitled to summary judgment on plaintiffs' Fair Housing Act, Equal Credit Opportunity Act, and Civil Rights Act claims as to Big Talk's 2003 commercial loan application because plaintiffs cannot establish intent to discriminate on the basis of race or gender. Specifically, defendant contends that plaintiffs have offered no evidence that similarly situated non-members of the protected classes were provided loans.

Plaintiffs claim in the amended complaint that the defendant's actions surrounding the 2003 commercial loan application violated the Fair Housing Act, 42 U.S.C. § 3601-3619. Plaintiffs did not address their Fair Housing Act claim in opposition to the motion for summary judgment. The Court cannot discern what cause of action plaintiffs would have under that Act in the circumstances alleged in the amended complaint. 42 U.S.C. § 3605 does prohibit an entity engaging in residential real estate related transactions from discriminating. Residential real estate related transactions include the making of a loan secured by residential real estate. 42 U.S.C. § 3605(b). However, plaintiffs do not contend that they were subject to discrimination in

the application for such a loan. In fact, plaintiffs contend that they were discriminated against because Wells Fargo offered such a loan, which offer plaintiffs declined. Defendant is entitled to summary judgment as to plaintiffs' Fair Housing Act claim as to the 2003 commercial loan application. There are no genuine issues of material fact as to such claim.

The Equal Credit Opportunity Act ("ECOA") prohibits discrimination against any applicant for credit. 15 U.S.C. § 1691(a). Applicant includes a corporation. 15 U.S.C. § 1691a(f). The term applicant also includes "any person who is or may become contractually liable regarding an extension of credit . . . the term includes guarantors, sureties, endorsers, and similar parties." 12 C.F.R. § 202.2(e).

Defendant does not address whether one or both plaintiffs have standing to assert a claim under the ECOA. The loan documents show that only Big Talk was the applicant for the 2003 loan at issue. The records of the South Dakota Secretary of State, of which I take judicial notice, show that Big Talk was incorporated in October 2003 by Torgerson. She has been listed as the only officer in the records of the Secretary of State. No records before the Court show the identity of the stockholders. Defendant does not argue that the corporation is not a proper party to an ECOA claim. However, even though Torgerson was the person acting on behalf of the corporation in its 2003 loan application, she herself did not apply for a loan. There is nothing in the record to show that she agreed to guarantee the loan. We know that she did not accept an offer of credit that would have included a mortgage of some of her personal assets. Big Talk clearly sought credit from Wells Fargo on the terms that such credit would be secured only by the land, building, and equipment associated with the Browning restaurant. The evidence is clear that those assets (or at least the land and the building) were not owned by Big Talk. Torgerson personally has no individual ECOA claim as to the 2003 commercial loan and, therefore, no claim for any damages she may have personally suffered as a result of her subsequent extension of personal credit to Big Talk for the purpose of funding the Montana Taco John's venture.

Under the ECOA, discrimination against an applicant means "to treat an applicant less favorably than other applicants." 12 C.F.R. § 202.2(n). To establish a prima facie case of lending discrimination under ECOA, Big Talk must show that

(1) plaintiff was a member of a protected class,

10

>   (2) plaintiff applied for and was qualified for a loan with the bank,
>   (3) the loan was rejected despite plaintiff's qualifications, and
>   (4) the bank continued to approve loans for applicants with similar qualifications.

Rowe v. Union Planters Bank of Southeast Missouri, 289 F.3d 533, 535 (8th Cir. 2002). *See also* Oti Kaga, Inc. v. South Dakota Housing Development, 324 F.3d 871, 882-83 (8th Cir. 2003) (prima facie elements of a Federal Housing Act claim). "Implicit in the fourth element is the requirement that the non-members be similarly situated." Oti Kaga, 324 F.3d at 883.

Plaintiffs contend that the Rowe elements are better known as the McDonnell Douglas test and do not apply to this case but instead apply only to employment discrimination claims. There is seldom eye-witness testimony that an employment decision was made on a discriminatory basis, the so-called "smoking gun" evidence. Consequently, the Supreme Court developed a three-part burden shifting method by which a plaintiff can prove intentional discrimination in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the McDonnell Douglas analysis, the plaintiff must first satisfy the prima facie elements of employment discrimination. The burden then shifts to the defendant to proffer a legitimate and nondiscriminatory reason for the employment decision. If the defendant makes such a showing, the burden shifts back to plaintiff to establish that this nondiscriminatory reason for the action was pretextual and that illegal discrimination was a motivating factor in the employment decision. This burden shifting analysis only applies where there is no direct evidence of discrimination. Bearden v. International Paper Co., 529 F.3d 828, 831 (8th Cir. 2008). Plaintiffs claim that analysis is improper here because they have direct evidence of discrimination.

Rowe was not an employment discrimination case but was instead an action under the Fair Housing Act and the ECOA. I am thus bound to apply the reasoning therein. In any event, plaintiffs have no so-called "smoking gun" evidence that the 2003 loan was denied on an illegal discriminatory basis. Plaintiffs contend that Wolff and others made the following statements during the loan application:

>   •Now, Terri, you understand that if you get this loan, you have to pay it back.

11

- Communities on Indian Reservations were so risky for banks that the defendant would not put automatic teller machines in those areas.
- The loan "did not fit in the box."
- The town of Browning is incorporated and located on the reservation.
- Terri is a tribal member of the Sisseton Wahpeton Oyate.

Plaintiffs further contend that Wells Fargo ran a credit check on Torgerson's husband, although he was not an applicant for any loan, evidencing gender discrimination. None of the foregoing would be sufficient to show that Big Talk was qualified for a loan under the terms applied for or that the loan was rejected on the basis of Torgerson's race or gender. Indeed, plaintiffs refer in their brief to the foregoing as creating "a reasonable inference" that race and gender were taken into consideration in the credit decision. An inference does not amount to a "smoking gun" and does not support plaintiffs' contention that the Rowe elements are inapplicable in this case.

Plaintiffs submitted no evidence that Big Talk applied elsewhere for credit and was approved for a $250,000 loan secured only by the land, equipment, and building for which the loan proceeds were to be used to purchase and erect. Big Talk actually offered no security since it owned nothing and submitted no plan to own anything. Further, plaintiffs did not submit any evidence to substantiate the assertion that "similar loans were approved for [applicants] of a different race with similar qualifications." Rowe v. Union Planters Bank, 289 F.3d at 535. Plaintiffs instead rely upon the affidavit of a retired banker that, in his opinion, "Wells Fargo would not have treated a similarly situated white male customer in a similar fashion." Absent evidence that others not in its protected class were in fact treated more favorably, plaintiffs cannot establish a prima facie case. The affidavit is pure speculation.

Plaintiffs also contend that

> the bank treated Terri differently than it would have treated similarly situated white, male customers in many other aspects of the credit and contract transactions - other than by a loan denial. Plaintiffs contend that the Bank ignored her loan applications, repeatedly lied to her, continually delayed her loan applications, when it was in the Bank's own interests, intentionally falsified her bank records to cover itself, and illegally failed to notify her of the Bank's denial of her loan applications and the reasons therefore. This conduct is equally violative of both the ECOA and the Civil Rights statues . . .

Plaintiffs' Brief in Opposition to Defendant's Motion For Summary Judgment, Doc. 46.

> Plaintiffs further contend that Wells Fargo's attitude was
>> patronizing, paternalistic - that they did not give Terri, or Native American Businessmen, for that matter, the credit they deserved, based upon their achievements and their status. The (sic) treated them, to some degree, like little children, who could be ignored, manipulated, or misled, without complaint.

*Id.* Plaintiffs have failed to cite to any authority holding that any of the foregoing violate the lending discrimination provisions of the ECOA or the Civil Rights Acts, absent any evidence that white, male credit applicants were treated differently.

Plaintiffs contend that "it is impossible for the plaintiffs to present a comparable case where a white, male customer was treated differently from the way Terri was treated." *Id.* Plaintiffs cite no authority for the proposition that Big Talk can recover under either the ECOA or the Civil Rights Acts on the basis of discrimination merely by showing that the bank knew that Torgerson was a Native American female and that plaintiff Big Talk was denied credit under the terms sought. Summary judgment is appropriate as to the ECOA and Civil Rights claims arising out of Big Talk's 2003 commercial loan application to the extent those claims are based upon lending discrimination.

Defendant also contends that it is entitled to summary judgment on plaintiffs' Equal Credit Opportunity Act and Civil Rights Act claims arising out of the bank's alleged failure to respond to the 2003 commercial loan application within 30 days. Defendant contends that it did not deny the 2003 commercial loan application and therefore was not required to give any written response to Big Talk's loan application. Defendant further contends that it did in fact offer a loan to plaintiffs on similar terms as requested, precluding recovery under the ECOA.

The ECOA provides that a creditor shall, within thirty days after receipt of a completed application for credit, notify the applicant of its action on the application. 15 U.S.C. § 1691(d). Plaintiffs contend in their brief, without citation to the record, that Torgerson applied for the loan at issue here in August 2003. However, plaintiffs allege in their amended complaint that Torgerson did not even inquire orally about the possibility of Wells Fargo providing start-up capital for the Montana Taco John's venture until September 2003. Big Talk, the only applicant, was not even incorporated until late October of 2003.

Wolff, orally and in writing, advised Torgerson on November 26, 2003, that additional information would be needed prior to approval of the loan request. On December 1, 2003, Torgerson declined, in writing, to provide additional information.[1] Torgerson certainly knew that she owned the Montana real estate and that Big Talk had no rights as to it. On December 10, 2003, Jane Schneider requested a reversal of the underwriter's recommendation to deny the loan. Mark Wolff approved a loan with different terms on that same date and sent Torgerson a written proposal on December 11, 2003. Genuine issues of material fact exist whether defendant acted in a timely and appropriate manner.

An application is not "complete" for the purposes of the ECOA until the "creditor has received all the information the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including, but not limited to, credit reports, any additional information requested from the applicant, and any approvals or reports by governmental agencies or other persons that are necessary to guarantee, insure, or provide security for the credit or collateral)." 12 C.F.R. § 202.2(f). "[A] creditor may request any information in connection with a credit transaction." 12 C.F.R. § 202.5(a)(1). Wells Fargo may have been entitled to request the information requested by Wolff on November 26, 2003. The Big Talk loan application may not have been "complete" at that time since Torgerson declined to provide the additional information requested by the bank. Questions exist as to whether Wells Fargo itself considered the application complete when the application was forwarded to its underwriter. Schneider was advised by the Montana underwriter on November 24, 2003, that the 30 day Reg B period had lapsed or was going to lapse on that date. Genuine issues of material fact exist as to whether Wells Fargo failed to give timely notice.

Plaintiffs did receive notification of Wells Fargo's action on the application for credit. On December 11, 2003, Wolff made a written counteroffer "which (by necessary implication)

---

[1] Torgerson complains in that letter that, with her assets and banking history, his requests for additional information were unreasonable. However, Torgerson did not personally pledge or offer to pledge any of her assets as collateral for the loan and refused a counter-offer loan whereby one of her personal assets would be used as collateral for the loan. She claims that Wells Fargo should have extended credit to a newly formed corporation with no assets and no existing collateral based upon her assets, which she refused to put up as collateral.

14

constituted denial" of the Big Talk loan request on the terms which Torgerson had offered. Riggs Nat. Bank of Washington, D.C. v. Webster, 832 F.Supp. 147, 150 (D.Md. 1993). Whether this was timely remains to be seen.

The ECOA also requires a creditor to provide written notice to the applicant against whom adverse action is taken. 15 U.S.C. § 1691(d)(2). The term "adverse action"

> means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested.

15 U.S.C. § 1691(d)(6). Either result would be an adverse action. Defendant contends that no adverse action occurred because Wells Fargo did in fact grant credit "in substantially the amount or on substantially the terms requested." Plaintiffs deny that the terms of the counteroffer were substantially the same as requested. The terms of the counteroffer included a mortgage on Torgerson's lake home, which plaintiffs claim does not constitute "substantially the terms requested." Plaintiffs may have demanded an unsecured loan to a newly formed corporation with no assets. Defendant offered a secured loan to a different entity (Torgerson) with the security coming from Torgerson. The Court would not expect that any lender would loan $250,000 to a corporation with no assets and nothing to offer as security. It is clear that Wells Fargo did not refuse to grant credit in substantially the amount requested. It is not clear whether Wells Fargo refused to grant credit on substantially the terms requested. If defendant did so, an adverse action was taken and proper notice was required. Torgerson claims that the commercial loan was to be secured by the Montana land, which she owned, and the building to be erected thereon. If her personally owned land was in fact being offered as collateral, it is for the trier of fact to determine whether a counter-offer mortgage on a different piece of real estate constituted substantially the terms requested. At a minimum, genuine issues of material fact exist as to whether Wells Fargo took adverse action against plaintiffs.

ECOA Regulation B sets forth the creditor's notification requirements as to an application for credit:

> (a) Notification of action taken, ECOA notice, and statement of specific reasons--
> (1) When notification is required. A creditor shall notify an applicant of action taken within:

15

> (i) 30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application;
> (ii) 30 days after taking adverse action on an incomplete application, unless notice is provided in accordance with paragraph (c) of this section;
> (iii) 30 days after taking adverse action on an existing account; or
> (iv) 90 days after notifying the applicant of a counteroffer if the applicant does not expressly accept or use the credit offered.

12 C.F.R. § 202.9(a)(1). Genuine issues of material fact exist as to whether the application from Big Talk was complete. In other words, had Big Talk furnished all information requested by defendant? It is true that additional information was requested and not supplied but questions remain as to whether the additional information was timely sought and sought in good faith. In accordance with § 202.9(a)(3)(i)(A), as to business applicants, the creditor can comply with the foregoing requirements by giving notice orally or in writing. Genuine issues of material fact exist as to whether a Regulation B notice was required and, if so, when and whether such notice was given orally or in writing (by virtue of a written counteroffer).

Summary judgment is not appropriate as to plaintiffs' ECOA claim that they did not receive timely and proper notice of an adverse action on the loan application. That being the case, summary judgment is not appropriate as to the Civil Rights Acts claims as to failure to provide notice for the same reasons set forth above as to plaintiffs' Civil Rights claims as to the failure to provide notice.

As set forth previously, Regulation B provides that a creditor shall notify an applicant of adverse action taken within 90 days after notifying the applicant of a counteroffer if the applicant does not expressly accept or use the credit offered. Regulation B further provides specific written notice as to an application that is incomplete:

> (c) Incomplete applications--
> (1) Notice alternatives. Within 30 days after receiving an application that is incomplete regarding matters that an applicant can complete, the creditor shall notify the applicant either:
> > (i) Of action taken, in accordance with paragraph (a) of this section; or
> > (ii) Of the incompleteness, in accordance with paragraph (c)(2) of this section.

16

> (2) Notice of incompleteness. If additional information is needed from an applicant, the creditor shall send a written notice to the applicant specifying the information needed, designating a reasonable period of time for the applicant to provide the information, and informing the applicant that failure to provide the information requested will result in no further consideration being given to the application. The creditor shall have no further obligation under this section if the applicant fails to respond within the designated time period. If the applicant supplies the requested information within the designated time period, the creditor shall take action on the application and notify the applicant in accordance with paragraph (a) of this section.
> (3) Oral request for information. At its option, a creditor may inform the applicant orally of the need for additional information. If the application remains incomplete the creditor shall send a notice in accordance with paragraph (c)(1) of this section.

12 U.S.C. § 202.9(c). Further,

> When an applicant submits an application and the parties contemplate that the applicant will inquire about its status, if the creditor approves the application and the applicant has not inquired within 30 days after applying, the creditor may treat the application as withdrawn and need not comply with paragraph (a)(1) of this section.

12 C.F.R. § 202.9(e).

Genuine issues of material fact exist as to whether defendant complied with the foregoing sections.

Finally, Regulation B of the ECOA provides not only that the creditor is prohibited from discriminating against an applicant, 12 U.S.C. § 202.4(a), but also prohibits discouragement:

> A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

12 U.S.C. § 202.4(b). Genuine issues of material fact exist as to whether defendant did engage in discouragement. Further, a "creditor shall not inquire about the race, color, religion, national origin, or sex of an applicant or any other person in connection with a credit transaction," except in connection with the collection of data for compliance purposes. 12 C.F.R. § 202.5(b). At a minimum, genuine issues of material fact exist as to whether defendant violated Regulation B with respect to improper inquiries. Regulation B provides a cause of action for merely inquiring

17

about the race or gender of any person in conjunction with an application. 12 C.R.F. § 202.16(b) provides, in part:

> any creditor that fails to comply with a requirement imposed by the Act or this regulation is subject to civil liability for actual and punitive damages . . . violations of the Act or this regulation also constitute violations of other federal laws. Liability for punitive damages can apply only to nongovernmental entities and is limited to $10,000 in individual actions . . . section 706(d) authorizes the awarding of costs and reasonable attorney's fees to an aggrieved applicant in a successful action . . . As provided in section 706(f), a civil action under the Act or this regulation may be brought in the appropriate United States district court without regard to the amount in controversy or in any other court of competent jurisdiction within two years after the date of the occurrence of the violation.

The court notes that plaintiffs make various complaints about "missing" records. It is not surprising that records dating back to 2002 have been destroyed. It is also not surprising that memories have faded. This lawsuit was not filed until 2005. After the filing, as the record reflects, the parties "sat" on the lawsuit and did nothing other than perhaps engage in some fruitless negotiations. In fact, the complaint had not even been answered and was not answered until the court became aware of nothing being done in this action. This lawsuit could well have been dismissed for failure to prosecute had the defendant answered the complaint in a timely manner. Delays and procrastination make it difficult for all concerned to know what happened when. It is ultimately the responsibility of the plaintiff to move a case forward. It is not the responsibility of the defendant to do so.

The defendant filed on January 20, 2009, (Doc. 52) what is said to be motions in limine. It seeks to "strike specific forms of relief sought in the Amended Complaint." It seeks to strike from the amended complaint the second claim for relief, the fourth claim for relief, and the eighth claim for relief. The defendant has also filed on January 22, 2009, a motion in limine regarding punitive damages (Doc. 56). Motions in limine may not be used for any such purposes. The defendant is seeking to accomplish through the motions in limine what should have been addressed in a timely and properly documented motion for summary judgment or a motion to dismiss. This is not to be permitted and would constitute an ambush of the plaintiffs. The motion for a partial summary judgment fails to address in any meaningful fashion the following

claims for relief: second, fourth, eighth, and ninth. Accordingly, these claims are not to be dismissed at this stage of the case.

Genuine issues of material fact exist as to whether defendant violated the discouragement prohibitions or made improper inquiries prohibited by the provisions of Regulation B. Further, genuine issues of material fact exist as to whether defendant complied with the notification requirements as to the claimed incomplete application or counteroffer. Genuine issues of material fact also exist as to claims discussed above throughout this opinion.

## ORDER

Now, therefore,

IT IS ORDERED:

1. The motion, Doc. 41, for partial summary judgment is granted in part and denied in part

2. Summary judgment is granted as to plaintiffs' third and sixth claims for relief.

3. Summary judgment is denied as to plaintiffs' 42 U.S.C. § 1982 claim set forth in their fifth claim for relief.

4. Summary judgement is denied as to plaintiffs' seventh claim for relief.

5. The motion in limine, Doc. 55, as to punitive damages, is denied.

6. The motion in limine, Doc. 52, is denied as to part one and granted as to parts two and three.

Dated this 3rd day of February, 2009.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
DEPUTY
(SEAL)